STATE OF LOUISIANA

VERSUS

LOK C. AU

NO. 23-KA-90

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 17-6147, DIVISION "I"
HONORABLE NANCY A. MILLER, JUDGE PRESIDING


December 20, 2023


**SCOTT U. SCHLEGEL**
**JUDGE**


Panel composed of Judges Susan M. Chehardy,
John J. Molaison, Jr., and Scott U. Schlegel


**CONVICTION AFFIRMED; SENTENCE ON
COUNT THREE VACATED; REMANDED FOR
RESENTENCING ON COUNT THREE**
   **SUS**
   **SMC**
   **JJM**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
     Honorable Paul D. Connick, Jr.
     Juliet L. Clark
     Thomas J. Butler

COUNSEL FOR DEFENDANT/APPELLANT,
LOK C. AU
     Gwendolyn K. Brown

**SCHLEGEL, J.**

Defendant/appellant, Lok C. Au, appeals his conviction and sentence for indecent behavior with a juvenile under the age of thirteen in violation of La. R.S. 14:81.  For the reasons that follow, we affirm defendant's conviction, and vacate and remand the case for resentencing.[1]

PROCEDURAL HISTORY

On July 24, 2018, the Jefferson Parish District Attorney filed a bill of information charging defendant, Lok C. Au, with sexual battery upon a known juvenile (DOB 6/2/2008) wherein the child was under the age of thirteen in violation of La. R.S. 14:43.1 (count one).[2]  On August 24, 2018, defendant pled not guilty.  A superseding bill was filed on September 25, 2019, adding count three, which charged defendant with indecent behavior with a juvenile (DOB 6/2/2008) in violation of La. R.S. 14:81.

On October 3, 2019, a superseding bill charged defendant with sexual battery of a known juvenile (DOB 6/2/2008) under the age of thirteen in violation of La. R.S. 14:43.1 (count one), and indecent behavior with a juvenile (DOB 6/2/2008) under the age of thirteen in violation of La. R.S. 14:81 (count three).  He pled not guilty on October 7, 2019.  The alleged victim is M.G.

On February 12, 2020, the defendant was found guilty on both counts by a jury with a verdict of ten to two.  The defendant was sentenced on March 9, 2020 to 35 years imprisonment on count one, and to 15 years of imprisonment on count three.

---

[1]  In accordance with La. R.S. 46:1844(W)(3), the victim, who is a minor, and the witnesses whose names can lead to the victim's identity (parent, sibling, or relative with the same last name) will be referred to by their initials in order to protect the victim's identity.

[2]  In the same bill, K.P. was charged in count two with cruelty to a juvenile (DOB 6/2/2008) in violation of La. R.S. 14:93.

On August 14, 2020, this Court granted defendant's motion to remand his case to the trial court to reconsider his motion for new trial in light of the decision of the United States Supreme Court in *Ramos v. Louisiana*, 590 U.S. __, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020). The trial court granted defendant's motion for new trial. A second trial began on March 14, 2022, but a mistrial was declared on March 15, 2022 due to the illness of co-counsel for the defendant.

Defendant's third trial was held from August 15 to 17, 2022. On August 17, 2022, the trial court declared a mistrial as to count one when the jury was unable to reach a verdict. As to count three, the jury unanimously found defendant guilty as charged of indecent behavior with a juvenile under the age of thirteen.

On September 12, 2022, the State entered a *nolle prosequi* as to count one and defendant's motion for new trial was denied. On that day, defendant was sentenced to twenty years imprisonment at hard labor as to count three. Defendant filed a motion to reconsider sentence on October 12, 2022. Defendant filed a motion for appeal and designation of record on November 3, 2022. The motion to reconsider sentence was heard and denied on December 1, 2022. Thereafter, the judge granted the motion for appeal and designation of record.

FACTS

M.G., age fourteen at the time of trial and in the ninth grade, testified that she has two younger biological sisters and that they have the same mom, K.P. She recalled that she started living with L.F. and T.F. when she was eight years old, and they officially adopted her on December 17, 2018 when she was ten years old. Before that, she lived with her mother and Aunt Marie in Mississippi.

While living with her mother, M.G. met defendant, whom she knew as "Bill", through her mom. M.G. knew that K.P. was with different men for money because K.P. brought M.G. along with her sometimes. M.G. said she and K.P. went to various places with Bill, such as casinos and hotels, and that when he

would leave, he would give them both money. M.G. would then give the money to her mother, K.P. M.G. testified that the hotel rooms had two beds, and that she was left alone in the room with Bill more than once.

M.G. testified that during these times Bill touched her body twice. K.P. was not in the room either time. On one occasion, she was on the bed, wearing a shirt and underwear, when Bill got on the bed with her. He then put his finger inside of her underwear on her vagina. Afterwards, she went into the bathroom and checked herself because it hurt where he touched her. The second time, she was in bed wearing only a shirt and underwear, when Bill got in the bed and put his finger inside her underwear on her vagina again.

She said there was also a time when she saw Bill's penis. According to M.G., defendant walked over to the bed wearing briefs, pulled his underwear to the side so she could see his penis and said, "Touch it." When he told her to touch it, she said she did because he was an adult.

Bill also kissed M.G. on the lips on more than one occasion, and placed his tongue in her mouth. She did not want him to do that so she told K.P., but K.P. did not do anything about it. M.G. did not feel that there was anything she could do to stop Bill from doing these things to her. M.G. also testified about a time when she saw people having sex on T.V. after Bill turned on the television.

When M.G. was eight, she went to live with T.F. and L.F. She did not immediately tell them about what Bill did to her, but eventually she told L.F. about what Bill had done. She did not tell L.F. everything at once because it was "weird," and she was scared to tell anyone because her mother, K.P., had told her not to tell anyone. She also did not tell the forensic interviewer in Mississippi everything when she was eight years old. At some point, she did disclose everything.

K.P., M.G.'s biological mother, testified that she gave birth to three daughters, including M.G. M.G. and one of her sisters have the same father. K.P. acknowledged that the State was prosecuting her for cruelty to a juvenile and that it was related to defendant's trial. She met defendant, whom she called "Bill Lok Au," when he made her a car key. At that time, she did not have a job, and only M.G. had been born. K.P. testified that they were friends but that after some time, he suggested that he help her financially. She stated that he gave her money after they had sex and that she would not have had sex with him otherwise. At that time, she was living with her Aunt Marie in Mississippi. K.P. testified that they usually met at the Evergreen hotel in Jefferson Parish. She acknowledged that she was abusing drugs at that time and that two of her children were born addicted to cocaine. One daughter was also born with cerebral palsy.

K.P. acknowledged that she sometimes brought M.G. with her to the Evergreen hotel. When asked if she ever had sex with defendant while M.G. was in the room she initially answered in the negative. She also testified that she was high from drugs at the time and thought that things happened that she did not realize or could not remember. She initially stated that she left M.G. and defendant alone together for only about five minutes while she got ice, but denied leaving the hotel to get drugs. She later acknowledged that she would in fact leave M.G. alone with defendant while she went to get drugs. K.P. testified that she never saw defendant abuse M.G. and that M.G. never told her that defendant kissed M.G. on the lips or touched her, other than a kiss on the cheek.

L.F. testified that she is the mother of six children, three of whom she adopted with her husband, T.F. The three adopted children, A.F., E.F., and M.G. are the biological daughters of K.P., and initially came to her as foster children. L.F. and her husband did not know K.P. before adopting A.F. as an infant in 2014. A.F. was born on cocaine and spent approximately three weeks in the Neonatal

Intensive Care Unit before L.F. and her husband could bring her home. When they adopted A.F., M.G. (the victim) was six years old and was living with K.P. For a period of time, M.G. was not living with her mother, K.P., and was being cared for by what were believed to be paternal relations, who would occasionally bring M.G. to visit A.F.

When E.F., K.P.'s third daughter, was born in 2016 on a multitude of drugs and with severe medical issues, the State removed her from K.P.'s custody and ultimately placed her with L.F. and her husband in 2016 as a foster child. Then, in July 2016, the State contacted L.F. and her husband and asked if they would also take M.G., who was now eight years old, as a foster child, because M.G. was also going to be removed from K.P. They agreed.

One day, M.G. was "acting off," so L.F. told M.G. to go and sit in her room and think about what was going on, and that L.F. would come and talk to her in a minute. When L.F. went in to talk to M.G., she said, "I was just thinking about the time Bill kissed me." L.F. asked, "On your cheek?" M.G. replied, "No, in my mouth," and showed and described to her how he used his tongue and what his mouth did with her. L.F said, "A French kiss?" M.G. said, "What's that?" L.F. explained that would be him sticking his tongue in her mouth. M.G. said that is what happened and that her mother, K.P., knew. L.F. testified that she did not know who "Bill" was when M.G. first said this. L.F. testified that they contacted M.G.'s social worker in Mississippi regarding this initial disclosure. L.F. believed the social worker contacted the police and took M.G. to a forensic interview.

L.F. stated that sometime after the forensic interview, M.G. told her that Bill had showed himself to her and that it was "real saggy and gross." M.G. also described pornography on the television in the hotel room, and told L.F. that Bill had stuck his fingers inside of her vagina, and that it had really hurt. L.F. said that her two-year old adopted daughter, A.F., told L.F. that M.G. was sucking her

crotch. L.F. asked M.G. about this, and M.G. said she was doing what had been done to her.

L.F. testified that at some point they contacted law enforcement. An officer in Mississippi took M.G.'s statement, but told them it was out of their jurisdiction. L.F.'s husband, T.F., subsequently took M.G. to Louisiana, where she had to give more statements about what Bill did to her. L.F. testified that M.G. was now 14 years old, had been in therapy, and was doing well. L.F. denied telling M.G. to lie or make up things about Bill so that she could get custody of her.

L.F. acknowledged that she knew that K.P. was a prostitute and was with additional men besides defendant and that M.G. had witnessed her mother's drug use. Bill was the only "boyfriend" of K.P.'s that M.G. talked about staying with overnight in a hotel.

T.F. testified that in August 2017, he and his wife, L.F., called the Pearl River County Sheriff's Office in Mississippi where they live. They were told to contact M.G.'s social worker and the law enforcement agency for the jurisdiction where the actual activity occurred. They ultimately took M.G. to the Audrey Hepburn CARE Center at Children's Hospital in New Orleans. Since M.G. only knew the person as "Bill," T.F. called his wife, L.F., so that she could get in contact with family members to try to get a name and a possible phone number for Bill. T.F. was present when a single photograph was shown to M.G., and she identified the person as the perpetrator.

On August 16, 2017, Detective Peter Foltz of the Kenner Police Department was told to go to the Audrey Hepburn CARE Center regarding a juvenile making allegations of sexual abuse. When he arrived, he spoke with caseworker Alicia Porter and Dr. Jamie Jackson. M.G. was also at the CARE Center, accompanied by her foster father, L.F. Detective Foltz testified that the Kenner Police Department was contacted because based upon what M.G. had said, the abuse had

occurred at a hotel near the Treasure Chest Casino located in Kenner. It was determined that the alleged abuse occurred at the Evergreen Plaza Inn, which is in Metairie, and is handled by the JPSO. Detective Foltz contacted JPSO and asked them to send a deputy. Detective Foltz believed that M.G. said the perpetrator was named Bill Au. Detective Foltz testified that they attempted to determine who Bill Au was, and that T.F. contacted people in Mississippi and was able to obtain a potential telephone number for Mr. Au. Detective Foltz turned this information over to Deputy Brandon Cohen of JPSO.

Detective Brandon Cohen of JPSO was dispatched to the Kenner Police Department Complex regarding a complaint of child sexual abuse that took place in Jefferson Parish. When he arrived at the Kenner Police Department complex, he learned that the child sexual abuse took place at the Evergreen Motel in Metairie. Detective Cohen spoke to the victim's father about the complaint and was given the name "Bill" and a cell phone number. Detective Cohen testified that he gave this information to Detective Scott Bradley in the Personal Violence Unit. Using computer databases, Detective Bradley obtained a name that he ran through DMV records and found a photograph that he sent to Detective Cohen while he was in Kenner. This photograph was printed and shown to the child victim to see if she could make an identification. The victim identified the individual in the photograph as the person who sexually abused her.

In August 2017, Detective Scott Bradley was employed by the JPSO assigned to the Personal Violence Section. He testified that on August 16, 2017, a patrol deputy contacted him regarding a call from the Kenner Police Department on an allegation of child sexual abuse that occurred at the Evergreen Motel in Metairie. He was given a phone number, which lead to a named person assigned to the phone number. He got a driver's license picture of the person, which he sent to the patrol deputy. The victim, M.G., positively identified the individual in the

picture as the person who sexually abused her. After M.G. made the identification of the perpetrator, Detective Bradley arranged for her to go to the Jefferson Parish Children's Advocacy Center ("CAC") for a forensic interview. He was present at the CAC on August 30, 2017, in a separate room with a monitor where he could watch and listen when Brittany Bergeron Millet conducted the interview of M.G.

Dr. Jamie Jackson testified as an expert in the field of child abuse as a child abuse pediatrician. Dr. Jackson, who was employed at the Audrey Hepburn Care Center, examined M.G. on August 16, 2017. She also conducted a private interview with M.G. that was audio recorded and played for the jury. During the interview, M.G. explained to Dr. Jackson how she and K.P. would meet with Bill in the hotel room. M.G. described situations similar to what she testified to at the trial, about how Bill kissed her on the lips with his tongue in her mouth, how he showed her his "private part" and made her touch it, and how he stuck his finger in her private part twice.

Dr. Jackson also conducted a physical examination of M.G. She said that M.G.'s physical examination was normal but explained that a normal examination was not determinative of whether or not sexual abuse occurred. She testified that when she sees children for possible sexual abuse, most of the time there are no physical findings because of the child's anatomy.

Dr. Jackson explained that disclosure of abuse is a process and delayed disclosure is commonly seen with sexual abuse victims. Delayed disclosure does not automatically mean that the report is true. She stated that it is common for victims of child sexual abuse to wait to disclose it until they are in a safe environment. When asked if M.G. appeared "bubbly" and had a matter-of-fact manner, Dr. Jackson stated that it was not uncommon for a victim of child sexual abuse to have such an affect. She explained that M.G.'s affect did not indicate whether something happened or did not happen. Dr. Jackson testified that most of

the time when she sees a child, it is the second, third, or fourth time that the child is talking about the abuse, and that children would only become really emotional if they were sharing a certain part for the first time.

Dr. Jackson acknowledged that M.G. was seeing a counselor in Mississippi and explained that she never requested any notes or records from others and would instead talk to the child in private to obtain the information herself. Dr. Jackson explained that a disclosure may change over time depending on several things, including how someone reacts to the disclosure. Dr. Jackson agreed that false allegations of sexual abuse occur and that sometimes children say things that are not true. She also agreed that a child might say something untrue to please the person they are talking to and that children sometimes lie without an adult suggesting it to them. Dr. Jackson acknowledged that a child might lie to get themselves out of trouble or to get something they want. When asked if it was her job as a child abuse pediatrician to make a conclusion as to whether a child was telling the truth, she stated that she was not the end-all-be-all with knowing if a child is telling the truth, "[b]ut I can definitely say that she [M.G.] gave me clear statements with regard to sexual abuse."

Dr. Jackson agreed that in the interview, M.G. described being exposed to drugs and prostitution and seeing photographs of other naked men. She acknowledged that M.G. told her that she was allowed to leave K.P.'s custody because K.P. was on drugs and because M.G. was sexually abused. Dr. Jackson recalled that M.G. gave a history of sexual abuse and "about exposure to sexualized material" and environment. She testified that M.G. said she saw pictures of her biological father naked on his phone and pictures of her mom and another man having sex on her mom's phone. Dr. Jackson agreed that M.G. could have exhibited hyper-sexualized behavior from exposure to pornography and those photographs or from sexual abuse.

On August 30, 2017, Brittany Bergeron Millet, the forensic interviewer at the CAC, interviewed M.G. A recording of the interview was played for the jury. During the interview M.G. spoke about incidences similar to what she testified to at the trial, and that she had told Dr. Jackson about, including where Bill stuck his tongue in her mouth while kissing her; exposed his penis and asked her to touch it; and rubbed her buttocks, removed her panties, and penetrated her vagina with his finger. M.G. also described pornography being played on television.

After M.G. positively identified defendant, Lok Au, Detective Bradley obtained a warrant for his arrest. Defendant was arrested, and was transported to the investigations bureau. After Detective Bradley advised defendant of his *Miranda* rights, defendant waived his rights and made a statement. The statement was published to the jury.

Detective Bradley testified that defendant admitted to paying K.P. for sex, and admitted to having sex with K.P. while M.G. was in the hotel room at the Evergreen Hotel. Detective Bradley further said that defendant admitted that he was actually, at times, alone with M.G., and that defendant admitted to one kiss on the lips with M.G., but later indicated that it was two times. He said that defendant admitted watching pornography while M.G. was in the hotel room.

When giving his statement, defendant was told that the charge was sexual battery involving a child victim. Defendant stated that K.P. is the girl he usually sees since his wife passed away. He described the relationship as sexual and consensual. He denied that K.P. was his girlfriend, and said he paid her. Defendant said K.P. called him "Bill," and that his name is Bill. Defendant stated he sometimes went to her trailer in Mississippi and sometimes to the Evergreen hotel. He said they went to the hotel sometimes once a week and sometimes once a month. He said that K.P. used drugs, but denied that he used them.

Defendant explained that one summer, K.P.'s daughter, M.G., was out of school, and she would go with them to the movies. He stated that after the movies, they would go to the hotel and that M.G. would sleep. He explained that there were two beds and that he would leave after he and K.P. had sex. He said this happened two or three times, and that M.G. was asleep when he and K.P. made love. Defendant stated he was only alone with M.G. once and that she was asleep. He explained that when K.P. left, he would stay in the room another ten or fifteen minutes before leaving. He said he would watch television before he left, but he denied watching pornography alone. He said he would put pornography on when K.P. was there, but that M.G. was asleep when he did. He explained that they blocked M.G.'s view, and she could not see the pornography.

Defendant said he never intentionally showed M. G. his penis. He always wore pants. When he laid down on the bed, he would take his pants off, but would have boxer shorts on. Defendant said M.G. liked him and called him "Uncle Bill." He said that M.G. would hug him hello and goodbye. He indicated that she once wanted to kiss him on the lips, but he told her that she could not, and he pushed her away. He said K.P. was there that time. He might have kissed her a second time while in the trailer. Defendant denied that he ever laid in the bed with M.G., or that he ever showed her his penis. He said his boxers were loose, but he never showed her anything. He denied touching M.G. on her legs, buttocks, or vagina. Defendant told the detective that these allegations were made because K.P. and her boyfriend were trying to put him in jail.

Defendant called as witnesses several neighbors and relatives who all testified that defendant had a good reputation in the community. Frederick Bentel testified that he had lived next door to defendant for approximately 42 years. He said defendant has five children and seven grandchildren. He explained that defendant was married but that his wife passed away seven or eight years

previously. He testified that defendant did not have a reputation for being predatory towards children and that he trusted his own grandchildren around defendant. Mr. Bentel said defendant did not have a reputation for being aggressive or violent towards children and described him as a peaceful and law-abiding person.

Jan Knecht testified that defendant, whom she knows as Mr. Bill, has been her neighbor since 1986. She recalled that defendant lost his wife seven to ten years prior. Ms. Knecht testified that she never saw defendant "do anything other than normal dads do" and that she never saw him act inappropriately. She denied that he had a reputation as a person who acts inappropriately towards children or is aggressive or violent.

Jimmy Au, defendant's son, worked with him in the locksmith business. He explained that his mother passed away in 2011 and that his father did not respond well to her passing. He has two daughters that he would "bring around" his father and that they love defendant. He denied that his father has a reputation for behaving inappropriately toward children. He stated that defendant was never in trouble and described him "as law-abiding as they come." Jimmy stated that defendant has a reputation of being "as safe as it comes" around children.

Annette Alvarado, defendant's daughter, explained that she has three children and that they visit defendant. She said he does not have a reputation for acting inappropriately with children. She stated that defendant has a reputation as a law abiding, good citizen.

Edward Au, defendant's son, testified that defendant does not have a reputation for acting inappropriately towards children.

Henry Au, defendant's oldest son, described defendant as well-liked and said he did not have a criminal record. He said he had a reputation for being a law-abiding person.

## LAW AND ANALYSIS

A. Alleged errors related to expert witness testimony

In assignments of error numbers 1 through 5, defendant argues that the trial court erred by (1) admitting testimony of the State's expert witness, Dr. Jamie Jackson, that went beyond its admissible scope; (2) impermissibly excluding testimony of defendant's expert, Dr. Alicia Pellegrin; and (3) denying the motion for new trial that was based, in part, on these two rulings.

1. Testimony of Dr. Jackson

Defendant argues that Dr. Jackson testified to several opinions and conclusions that were not contained within her medical records, and were thus in violation of the discovery rules as set forth in La. C.Cr.P. art. 719(A). Specifically, he argues that Dr. Jackson testified that delayed disclosures of abuse, absence of physical findings, and an unemotional demeanor during questioning are all common in child abuse victims, while none of these conclusions are contained within the reports tendered in discovery. Defendant asserts that under such circumstances, he was denied the opportunity to properly prepare to cross-examine the expert or to obtain appropriate rebuttal testimony.

We disagree. To the extent that defendant contends that the State violated the provisions of La. C.Cr.P. art. 719(A), by failing to produce reports as to Dr. Jackson's testimony at the third trial, the defendant does not indicate what conclusions he is referring to. In addition, defendant did not object to Dr. Jackson's testimony on that basis during the trial, so in accordance with La. C.Cr.P. art. 841, he may not make that argument on appeal.

Defendant further argues that Dr. Jackson's opinions were not limited as required by law to "general behavioral characteristics of child abuse victims." Defendant asserts that Dr. Jackson's opinions often crossed the line into specific

conclusions about this particular child's physical examination findings, timing of disclosure, and her demeanor during questioning.

With respect to the scope of expert witnesses, La. C.E. art. 702(A), entitled "Testimony by experts", provides:

> A. A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (2) The testimony is based on sufficient facts or data;
> (3) The testimony is the product of reliable principles and methods; and
> (4) The expert has reliably applied the principles and methods to the facts of the case.

La. C.E. art. 704 further provides in pertinent part that "[h]owever, in a criminal case, an expert witness shall not express an opinion as to the guilt or innocence of the accused."

The trial court's decision to admit or exclude expert testimony is subject to the "abuse of discretion" standard. *State v. Thompson*, 22-497 (La. App. 5 Cir. 1/18/23), 356 So.3d 1185, 1190; *State v. Johnson*, 10-209 (La. App. 5 Cir. 10/12/10), 52 So.3d 110, 121, *writ denied*, 10-2546 (La. 4/1/11), 60 So.3d 1248.

The Louisiana Supreme Court has recognized the validity and admissibility of expert testimony relating to delayed disclosure in cases involving child abuse. *State v. Greene*, 06-667 (La. App. 5 Cir. 1/30/07), 951 So.2d 1226, 1238, *writ denied,* 07-0546 (La. 10/26/07), 966 So.2d 571. In *State v. Tipton*, 21-01478 (La. 10/16/21), 326 So. 3d 243, the Louisiana Supreme Court further recognized:

> In a prosecution for sexual offense(s) committed against a child, expert testimony of general characteristics that would explain delays in reporting, inconsistent reports, omissions of details, reluctance to testify, demeanor, and recantations is generally admissible provided that it meets the requirements of the Code of Evidence and does not invade the jury's province of determining credibility or otherwise violate the prohibitions contained in *State v. Foret*, 628 So.2d 1116 (La. 1993); *State v. Chauvin*, 2002-1188 (La. 5/20/03), 846 So.2d 697.

We conclude that the trial court did not abuse its discretion in admitting Dr. Jackson's testimony. Dr. Jackson testified that there were no physical findings related to M.G.'s statement of sexual abuse and that the physical findings were normal. She explained that everything being normal did not mean that sexual abuse did or did not occur. She stated that when she sees children for possible sexual abuse, most of the time there is not a physical finding because of the child's anatomy. She agreed that a delay in disclosure adds to the likelihood that there will not be a physical finding. Dr. Jackson explained that a disclosure may change over time depending on several things such as how someone reacts to the disclosure. Dr. Jackson provided that a disclosure is a process and that most kids do not disclose when something first happens. Instead, it is common for victims of child sexual abuse to wait to disclose it until they are in a safe environment. She said that it was not uncommon for a victim of child sexual abuse to have a "bubbly" or matter-of-fact affect and that such an affect was not indicative of whether or not abuse occurred. Dr. Jackson testified only generally and did not reach any specific conclusions about the physical findings, timing of disclosure, or demeanor of M.G. She did not testify as to whether abuse occurred or whether M.G. was credible. The trial court did not abuse its discretion with respect to the testimony of Dr. Jackson.

2. Disallowance of testimony of Dr. Pellegrin

Defendant argues that the trial court erroneously excluded the testimony of his expert, Dr. Alicia Pellegrin. Defendant asserted that this was apparently because the trial court relied upon a mistaken belief that it had previously ruled that Dr. Pellegrin was not qualified as an expert witness. Defendant further contended that she would have rebutted Dr. Jackson's conclusions.

During the trial, after the conclusion of the State's case and out of the presence of the jury, the trial court allowed defense counsel to call Dr. Pellegrin

and to proffer testimony regarding her qualifications. She testified via Zoom due to having COVID. She described her education, which included a graduate degree in clinical psychology, and that she had worked in forensic evaluations for the last 20 years. She testified that she had been qualified as a clinical psychologist, and as an expert in child custody evaluations, sex offender evaluations, and child sex abuse evaluations. Dr. Pellegrin testified that she had reviewed the testimony of Dr. Jackson on the previous day. The defense tendered her as an expert in forensic and clinical psychology and child sexual abuse evaluations.

On cross-examination on her qualifications, she acknowledged that she was being offered as an expert to testify concerning the testimony of Dr. Jackson. The trial court also questioned Dr. Pellegrin. The trial court further ruled as follows:

> All right. The defense has offered Dr. Pellegrin as an expert in the field of forensic clinical psychology and child sex abuse evaluations. The Court finds that she is indeed an expert based upon her testimony and her CV in forensic clinical psychology and child sex abuse evaluation. The Court has repeatedly asked defense what her testimony will be. And the answer that I have gotten back consistently and without fail is that she is going to contradict the -- or clarify or emphasize her differences with Dr. Jackson's testimony yesterday. However, when I went through the three areas of contention by Dr. Pellegrin with Dr. Jackson's testimony, Dr. Pellegrin agreed with the Court that Dr. Jackson did not testify to any of the conclusions that Dr. Pellegrin has listed in her report.
>
> Therefore, based upon the representations of defense as to what Dr. Pellegrin's testimony would be – after repeated requests to let me know what her testimony was going to be – and the admittance of the expert herself that the testimony she sought to contradict was not testified to yesterday, I am going to not allow her to testify.

The trial court went out of its way to consider Dr. Pellegrin's testimony, including letting her testify viz Zoom because she had COVID. The trial court conducted an extensive evaluation as to Dr. Pellegrin's qualifications and the subject matter of her testimony.

Contrary to defendant's argument, the trial court did qualify her as an expert in forensic clinical psychology and child sex abuse evaluation. Her testimony was disallowed because the purpose of her testimony was to rebut the testimony of Dr.

Jackson.  Dr. Pellegrin acknowledged that Dr. Jackson did not testify as to any of the conclusions that Dr. Pellegrin listed in her report.  Further, as discussed previously, Dr. Jackson did not make any conclusions as to whether sexual abuse occurred.  Thus, there was no need for any rebuttal testimony by Dr. Pellegrin.  The trial court did not abuse its discretion in disallowing the testimony of Dr. Pellegrin.

B.  Denial of defendant's motion to admit evidence of prior false allegations of sex abuse

In assignments of error numbers 1, 2, and 6, defendant argues that the trial court erred in denying his motion to admit evidence of prior false allegations of sex abuse and in denying his motion for new trial.  He asserts that these rulings improperly infringed upon his right to present a defense.

On October 10, 2019, prior to the first trial, the State filed a Motion *in Limine* to Preclude Questioning Victim about Prior Allegations of Sexual Assault Pursuant to Louisiana Code of Evidence 412.  The State moved to prevent any questioning of M.G. about Brian and Rashad, asserting that neither matter was investigated.  On December 9, 2019, the trial court granted the State's *motion in limine* without opposition.

Defendant's assertions as to prior false allegations were contained in his Motion to Admit Evidence of Prior False Allegations Pursuant to *State v. Smith*, filed on June 14, 2021.  The motion asserts that M.G.'s first allegation that defendant had sexually abused her was made in January 2017 in an initial forensic interview.  Defendant argues that during the January 12, 2017 interview, she denied any physical touching by defendant, but did allege that her cousin Rashad touched her vagina and made her touch his penis.  Defendant further argues that on August 16, 2017, during the interview by Dr. Jackson when she made a second disclosure alleging that defendant had sexually abused her, she also alleged

physical touching, including touching of her vagina, by her mother's former boyfriend, Brian. But when asked that day if anyone other than defendant or Brian had touched her, M.G. denied it, and did not mention her cousin Rashad.[3] Then, during the forensic interview on August 30, 2017, M.G. again alleged that Brian physically touched her, but this time she denied that he touched her vagina. During that interview, defendant alleges that she was asked if anyone else had touched her, and she again denied it, which contradicted her prior allegation against Rashad. Defendant submits that he should have been permitted to impeach M.G. about these alleged inconsistencies.

At the hearing on defendant's motion on June 28, 2021, the trial court referred the matter to the Court's previous ruling of December 9, 2019, when the trial court granted the State's motion *in limine* to preclude questioning about prior allegations of sexual assault. During the trial, defense counsel inquired about whether M.G. had seen other men's penises before. The trial court sustained the State's objection on the grounds that it had already ruled that the evidence was inadmissible.

A defendant has a constitutional right to present a defense. *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). The Sixth Amendment to the United States Constitution and Article I § 16 of the Louisiana Constitution guarantee an accused in a criminal prosecution the right to be confronted with the witnesses against him. *State v. Stalling*, 19-336 (La. App. 5 Cir. 1/29/20), 290 So.3d 332, 340, *writ denied,* 20-00326 (La. 7/24/20), 299 So.3d 76; *State v. Zeringue*, 03-697 (La. App. 5 Cir. 11/25/03), 862 So.2d 186, 195, *writ denied,* 03-3523 (La. 4/23/04), 870 So.2d 298. The primary purpose behind this right is to secure for the defendant the opportunity for cross-examination. *Davis v.*

---

[3] The trial record does not contain any evidence of M.G.'s statements regarding Brian or Rashad made during forensic interviews on January 12, 2017 in Mississippi, on August 16, 2017 to Dr. Jackson, or on August 30, 2017 to Ms. Millet. Apparently only redacted exhibits were admitted at the trial.

*Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). The right to present a defense and to confront witnesses includes the right of a defendant to attack the credibility of a witness by examining him or her concerning any matter having a reasonable tendency to disprove the truthfulness of his or her testimony. La. C.E. art. 607(C).

The right of an accused sex offender to present a defense is, however, balanced against the victim's interests under La. C.E. art. 412 (the rape shield statute), which is meant to protect the victim of sexual assault from having her sexual history made public. *State v. Zeringue*, *supra.* La. C.E. art. 412 prohibits evidence regarding the past sexual behavior of the victim in sexual assault cases, except when there is an issue of whether the accused was the source of semen or injury, and when the past sexual behavior is with the accused and there is an issue of whether the victim consented to the charged sexually assaultive behavior. Article 412 does not apply when a defendant attempts to use evidence of a victim's alleged false allegation of improper sexual behavior to impeach the victim's credibility. *State v. Smith*, 98-2045 (La. 9/8/99), 743 So.2d 199, 202–03; *State v. Bolden*, 21-283 (La. App. 5 Cir. 6/30/21), 325 So.3d 602, 605. However, the admissibility of such evidence is still subject to all other standards for admissibility under La. C.E. arts. 403, 404, 607, 608, and 613. *State v. Cervantes*, 18-535 (La. App. 5 Cir. 2/27/19), 266 So.3d 569, 573, *writ denied,* 19-00662 (La. 9/24/19), 279 So.3d 931; *State v. Bolden*, 325 So.3d at 605.

The trial court's determination regarding the relevancy and admissibility of evidence will not be overturned on appeal absent a clear abuse of discretion. *State v. Cervantes*, 266 So.3d at 573. When considering the admissibility of alleged prior false allegations, the question for the trial court is not whether it believed that the prior allegations were false, but whether reasonable jurors could find, based on the evidence presented by the defendant, that the victim had made prior false

accusations and whether all other requirements of the Code of Evidence had been satisfied. *State v. Smith*, 743 So.2d at 203, 204.

In *Smith*, cited by defendant, the victim admitted that she had previously made accusations of improper sexual behavior against her cousin, who was not the defendant. Two witnesses corroborated this. Another witness testified, however, that the victim had recanted the accusations. The Louisiana Supreme Court concluded that because the entire outcome of the case rested upon the jury's perception of the victim's veracity, the trial court should have allowed the testimony so the jury could determine if the victim had made false allegations in the past, and that the trial court's failure to do so was not harmless error. Similarly, in *State v. Cervantes*, 266 So.3d at 574, we stated that "[t]his Court has consistently upheld the trial court's grant of the State's motion *in limine*, where the victim has not recanted the earlier allegation and there is no independent witness to testify that the allegation was false." In the pending case, defendant never showed or attempted to show that M.G.'s allegations against others were false, and there was no independent witness to testify that the allegations were false.

Further, the fact that no criminal charges were brought is not determinative that a victim's allegations are false. *See State v. Bolden*, 325 So.3d at 606 ("The fact that no charges have been brought against T.S. in Orleans Parish is not determinative that A.T.'s allegations against him are false.")

Defendant attempts to rely upon the fact that M.G. did not consistently mention prior allegations throughout her interviews. However, this is not evidence of previous false statements. *See State v. Bolden*, 325 So. 3d at 606 (". . . the defendant only argued that the victim's reports of the other allegation were inconsistent, which was not evidence that the victim's prior allegation of abuse was false.")

Finally, even if M.G. had made statements that Brian or Rashad touched her, the statements would have been made when she was eight years old and in circumstances in which she was being interviewed in connection with allegations of abuse against defendant.

Defendant did not meet his burden of establishing that reasonable jurors could find that M.G. made prior false statements based on the evidence presented by defendant. Defendant's assignments of error on this issue are without merit.

C. Alleged Errors Regarding Sentencing

In assignments of error numbers 7, 8, and 9, defendant argues that the trial court erred by (1) increasing, without cause, defendant's sentence following his successful appeal after the first trial; (2) imposing an excessive sentence; and (3) denying the motion to reconsider sentence.

These arguments are pretermitted based upon the errors patent discussion below.

ERRORS PATENT REVIEW

We reviewed the record for errors patent, according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990). The following require corrective action.

La. C.Cr.P. art. 14:81(H)(2) provides that whoever commits the crime of indecent behavior with juveniles on a victim under the age of thirteen when the offender is seventeen years of age or older shall be punished by imprisonment at hard labor for not less than two nor more than twenty-five years. It further provides that "[a]t least two years of the sentence imposed shall be served without benefit of parole, probation, or suspension of sentence."

The trial court's sentence did not restrict benefits for any portion of the sentence.

Generally, when a trial court does not mention the restriction of benefits, such conditions are deemed to exist by operation of law under La. R.S. 15:301.1. *State v. Cepriano*, 21-262 (La. App. 5 Cir. 3/30/22), 339 So.3d 32, 47; *State v. Shelby*, 18-186 (La. App. 5 Cir. 12/27/18), 263 So.3d 1223, 1228. However, in this case, the trial court's failure to impose the statutory restrictions is not cured by La. R.S. 15:301.1 because the portion of the sentence to be served without benefits is left to the discretion of the trial court.

Accordingly, we vacate the sentence as to count three and remand the matter for resentencing.

DECREE

For the foregoing reasons, defendant's conviction on count three is affirmed. Defendant's sentence on count three is vacated, and the case is remanded to the trial court for resentencing in conformity with this opinion.

**CONVICTION AFFIRMED; SENTENCE ON COUNT THREE VACATED; REMANDED FOR RESENTENCING ON COUNT THREE**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**DECEMBER 20, 2023** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES
NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 23-KA-90

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE NANCY A. MILLER (DISTRICT JUDGE)
JULIET L. CLARK (APPELLEE)          THOMAS J. BUTLER (APPELLEE)          GWENDOLYN K. BROWN (APPELLANT)

**MAILED**
HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053